**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| THE OHIO STATE UNIVERSITY, | : | |
| | : | |
| Plaintiff, | : | Case No. 2:17-cv-01092-ALM-CMV |
| | : | |
| v. | : | Judge Algenon L. Marbley |
| | : | |
| REDBUBBLE INC., *et al.*, | : | Magistrate Judge Chelsey M. Vascura |
| | : | |
| Defendant. | : | |

**REDBUBBLE INC.'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56, Defendant Redbubble Inc. ("Redbubble" or "Defendant") hereby opposes Plaintiff The Ohio State University's ("OSU" or "Plaintiff") Motion for Summary Judgment (which is actually a motion for partial summary judgment, since it does not purport to dispose of the entire case). In addition, pursuant to Federal Rule of Civil Procedure 56, Redbubble cross-moves for summary judgment on OSU's Complaint and on each cause of action therein. Redbubble's Opposition and Cross-Motion are based on the attached Memorandum, the supporting Declarations of Arnaud Deshais ("Deshais Decl."), Anuj Luthra ("Luthra Decl."), Christopher Nunn ("Nunn Decl."), James Toy ("Toy Decl."), Ayaire Cantil-Voorhees ("Cantil-Voorhees Decl."), and Kenneth B. Wilson ("Wilson Decl."), [1] and the materials on file in this action.

---

[1] The Declarations in support of this Motion and Memorandum will be separately filed.

Respectfully submitted,


*/s/ Gerhardt A. Gosnell II*

James E. Arnold, *Trial Attorney*       (0037712)
Gerhardt A. Gosnell II                        (0064919)
JAMES E. ARNOLD & ASSOCIATES, LPA
115 W. Main St., Fourth Floor
Columbus, Ohio 43215
Telephone:      (614) 460-1600
Facsimile:      (614) 469-1093
Email:            jarnold@arnlaw.com
                      ggosnell@arnlaw.com


Kenneth B. Wilson (*pro hac vice*)
COASTSIDE LEGAL
455 1st Avenue
Half Moon Bay, CA 94019
Telephone: (650) 440-4211
Email: ken@coastsidelegal.com


*Counsel for Defendant Redbubble, Inc.*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION & SUMMARY OF ARGUMENT ..................................................1

FACTUAL BACKGROUND .........................................................................2

    A.    Background of Defendant Redbubble ...........................................2

    B.    Redbubble Does Not Design or Upload Content Sold on the Marketplace ............4

    C.    Redbubble Did Not Sell or Offer to Sell the Accused Products ............5

    D.    Redbubble Does Not Print or Otherwise Manufacture Products ............7

    E.    Redbubble Does Not Maintain Inventory of or Ship Finished Products ...............8

    F.    Redbubble's So-Called Competitors Utilize a Different Business Model ............8

    G.    Redbubble's Substantial Efforts to Combat Piracy .................................9

    H.    Background of this Dispute ..............................................15

    I.    OSU's Purported Post-Filing Purchases ..............................18

ARGUMENT ......................................................................................21

I.    THE UNDISPUTED FACTS ESTABLISH THAT REDBUBBLE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON EACH COUNT OF OSU'S COMPLAINT ..................................................... 21

    A.    First Count for Direct Trademark Infringement ..................................21

*Summary of Argument*: Redbubble is entitled to a determination on OSU's First Count for direct trademark infringement as a matter of law, since OSU has not established and cannot establish that Redbubble used the marks at issue in commerce. Courts have consistently held that intermediaries or "online marketplaces" are not deemed "sellers" and do not otherwise "use" the marks sold on their sites for purposes of trademark law. *Tre Milano, LLC v. Amazon.com, Inc.*, No. B234753, 2012 WL 3594380 (Cal. App. 2012); *Bird v. Parsons*, 289 F. 3d 865 (6th Cir. 2002); *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F. 3d 93, 103 (2nd Cir. 2010) *Milo & Gabby, LLC v. Amazon.com, Inc.*, 2015 WL 4394673 (W.D. Wash. July 16, 2015, *aff'd* 693 F. App'x 879 (Fed. Cir. 2017). The Redbubble Marketplace provides a platform where third-party Sellers upload their listings. The Redbubble Marketplace platform then automatically generates the product page, without Redbubble's active involvement. Redbubble requires Sellers to represent that they have all necessary rights in the products their selling, and that they are not infringing third-party intellectual property rights. Redbubble does not make the products offered for sale on its Marketplace. Redbubble does not sell or offer to sell such products; all sales and offers for sales are made by third-party Sellers.

    B.    Second Count for Lanham Act Unfair Competition ..............................28

*Summary of Argument*: The elements of OSU's federal unfair competition claim are the same as those for its direct trademark infringement claim. *See Victoria's Secret Stores v. Artco Equip. Co.*, 194 F. Supp. 2d 704, 724, fn. 8 (S.D. Ohio

2002) ("the same analysis applies" to federal trademark infringement claims and Lanham Act unfair competition or passing off claims). For the same reason Redbubble is entitled to judgment in its favor on the trademark infringement claim, Redbubble is equally entitled to summary judgment on this claim as well.

C.     Third Count for Counterfeiting ................................................................. 28

*Summary of Argument:* A counterfeiting plaintiff must plead and prove that a defendant not only infringed plaintiff's trademark, but (1) sold products with a "counterfeit" of the mark (i.e., "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark"), and (2) "intentionally used the mark knowing it was a counterfeit." *Too, Inc. v. TJX Cos.*, 229 F. Supp. 2d 825, 837 (S.D. Ohio 2002). For the same reasons Redbubble cannot be found to have "used" OSU's trademarks, Redbubble also cannot be found to have "used" counterfeits of those trademarks. Moreover, even in the unlikely event that Redbubble could be found to have "used" OSU's trademarks, no reasonable trier of fact could conclude that Redbubble has "intentionally" made or sold any product "knowing it was a counterfeit" of an OSU trademark.

D.     Redbubble Is Entitled to Judgment in Its Favor on OSU's Fourth Count
       for Violation of Right of Publicity Under O.R.C. Chapter 2741 .......................... 30

       1.     Redbubble Is Not Liable Because It Did Not Use Mr. Meyer's
              Persona ...................................................................................... 30

*Summary of Argument*: The elements of a statutory right of publicity claim apply only to someone who "uses" the plaintiff's persona for a commercial purpose. ORC § 2741.02(A). Redbubble has not made any use of Mr. Meyer's persona. At most, the evidence of record suggests that it may have received a service fee as a result of third party uses of Mr. Meyer's persona.

       2.     Redbubble Is Not Liable Because It Was an Intermediary ......................... 32

*Summary of Argument:* ORC § 2741.02(E) provides that "[t]he owners or employees of any medium used for advertising, including but not limited to, a newspaper, magazine, radio or television network or station, cable television system, billboard, transit ad, and global communications network, by whom any advertisement or solicitation in violation of this section is published or disseminated are not liable under this section or section 2741.07 of the Revised Code unless it is established that those owners or employees had knowledge of the unauthorized use of the persona." The Redbubble Marketplace qualifies as a "medium used for advertising" for purposes of the statute.

       3.     Redbubble Is Immune from OSU's State Law Right of Publicity
              Claim as an Interactive Computer Service Under Section 230 of
              the Communications Decency Act ....................................................... 33

*Summary of Argument*: Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230, specifies that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of

ii

any information provided by another information content provider." 47 U.S.C. § 230(c)(1). ). "Section 230 bars a claim if (1) the defendant asserting immunity is an interactive computer service provider, (2) the particular information at issue was provided by another information content provider, and (3) the claim seeks to treat the defendant as a publisher or speaker of that information." *Jones v. Dirty World Entertainment Recordings, LLC*, 755 F.3d 398, 409 (6th Cir. 2014).

a. Redbubble is an interactive computer service ......................................36

*Summary of Argument*: An "interactive computer service" is defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2). The undisputed facts demonstrate that Redbubble satisfied the definition of an "interactive computer service." See *Oberdorf v. Amazon.com, Inc.*, 295 F. Supp. 3d 496 (M.D. Pa. 2017) (noting that "[t]he Amazon Marketplace serves as a sort of newspaper classified ad section, connecting potential consumers with eager sellers in an efficient, modern, streamlined manner" and finding the Amazon Marketplace to qualify as an "interactive computer service.")

b. The accused content was provided by another information content provider ......................................................................36

*Summary of Argument:* "If a website displays content that is created entirely by third parties, then it is only a service provider with respect to that content – and thus is immune from claims predicated on that content." *Jones, supra,* 755 F.3d at 408. Here, there is no dispute that the Redbubble Marketplace exclusively "displays content that is created entirely by third parties," namely the Sellers.

c. OSU's right of publicity claim seeks to treat Redbubble as a publisher or speaker of the information in question ............................37

*Summary of Argument:* There is no question that OSU's right of publicity claim purports to hold Redbubble liable as a publisher or speaker of the images that it contends violates Mr. Meyer's publicity rights.

E. OSU'S Request for a Permanent Injunction Is Both Meritless and Premature ..............................................................................................38

*Summary of Argument:* OSU cannot possibly be entitled to a permanent injunction unless and until it has obtained a determination in its favor on the merits. Moreover, the scope of any injunctive relief that OSU might be entitled to, even if it were to prevail on the merits of its claims, is unclear at this point. Before Redbubble is subjected to an injunction under penalty of contempt, it should have the opportunity to receive notice of precisely what relief is being sought, learn from the Court what it believes Redbubble has done wrong, and have an

opportunity to argue the burden associated with complying with those particular obligations.

F.      OSU'S Request to Designate this Case Exceptional Is Without Merit .................39

*Summary of Argument:* Under the standard set forth by the U.S. Supreme Court in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014), an exceptional case is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." "Considering the totality of the circumstances" as the Supreme Court's opinion on *Octane Fitness* requires, this simply is not the "rare" case where a party's legal position is so frivolous or its litigation conduct so unreasonable to warrant an exceptional case determination. There is substantial authority that supports Redbubble's position that it cannot be held liable because it has not used the marks or publicity rights in question. OSU has not pointed to any purported wrongdoing regarding the "manner in which the case was litigated."

CONCLUSION........................................................................................................................41

CERTIFICATE OF SERVICE ...........................................................................................42

## INTRODUCTION & SUMMARY OF ARGUMENT

Redbubble is not liable for trademark infringement with respect to products offered or sold via the online marketplace it hosts, for the simple reason that Redbubble does not make or sell those products or otherwise use the marks in question. While for purposes of this motion Redbubble does not contest whether third party Sellers using the Redbubble marketplace have committed acts of direct trademark infringement or counterfeiting of OSU's trademarks, there is no legal basis for assigning liability for direct infringement to an online service provider like Redbubble.

The dispositive facts are not disputed. Redbubble did not design or upload the allegedly infringing content. Redbubble did not print or otherwise manufacture the products identified by OSU as purportedly infringing in its Complaint and/or its Motion for Summary Judgment (the "Accused Products"), nor does Redbubble own or control the facilities in which those products were made or the equipment or processes for doing so. Redbubble never took possession, control or ownership of or title to the Accused Products. Redbubble personnel did not pack, ship, perform quality control on or otherwise handle those products. And Redbubble does not itself sell or offer to sell the Accused Products. To hold Redbubble -- a party that has not made, offered for sale or sold the allegedly infringing products -- liable for direct infringement under the Lanham Act would be literally unprecedented.

Redbubble's business model differs markedly from that of SunFrog, Skreened, and other so-called "competitors" that have been held liable for direct trademark infringement. Unlike Redbubble, there was no dispute that both SunFrog and Skreened both made and sold the infringing products. That conduct served as the foundation for the courts' determinations that those parties engaged in direct trademark infringement. But Redbubble did not engage in such conduct. As a result, these opinions are inapposite.

1

A much better comparison is to the business model of the Amazon Marketplace, which has repeatedly been held immune from claims of direct trademark infringement because, like Redbubble, Amazon does not sell or manufacture the products sold by third parties using its marketplace platform. *See, e.g., Milo & Gabby, LLC v. Amazon.com, Inc.*, 2015 WL 4394673 (W.D. Wash. July 16, 2015) (finding no direct trademark infringement because Amazon was not the seller of the products); *Tre Milano, LLC v. Amazon.com, Inc.*, No. B234753, 2012 WL 3594380 (Cal. App. 2012) (same). In fact, the *SunFrog* court explicitly distinguished SunFrog's business model from that of a true marketplace like Amazon or Redbubble. *See H-D U.S.A., LLC v. SunFrog LLC*, 311 F. Supp. 3d 1000, 1037 (E.D. Wisc. 2018).[2]

In summary, the undisputed facts demonstrate as a matter of law that Redbubble cannot be held directly liable for either violation of the Lanham Act or violation of Ohio's statutory right of privacy because Redbubble does not engage in the requisite use of the content at issue, which is a predicate element of each of these claims. As these are the only claims in this case, Redbubble respectfully cross-moves for summary judgment on OSU's claims, and requests entry of judgment in its favor in this action as a matter of law.

## FACTUAL BACKGROUND

### A.    Background of Defendant Redbubble

Much like the Amazon Marketplace and eBay, Redbubble is a global online marketplace platform hosted at redbubble.com (the "Redbubble Marketplace"). [Toy Decl. Exh. A] Founded in 2006, and publicly traded on the Australian Securities Exchange since May 2016, Redbubble was formed with the goal to "[g]ive independent artists a meaningful new way to sell their creations), and it operates under the stated mission of "bringing more creativity into the world."

---

[2] This is the officially published version of the case cited in OSU's papers as *H-D U.S.A., LLC v. SunFrog LLC*, Case No. 17-cv-711-JPS (E.D. Wisc. April 12, 2018).

[Toy Decl. Exhs. A-B] The community of independent artists who use the Redbubble platform upload and sell their creative designs on high-quality, everyday products such as apparel, stationery, housewares, bags, wall art and so on. [Toy Decl. Exh. A] Through the Redbubble Marketplace, independent artists are able to profit from their creativity by selling their products to a new universe of fans, who in turn benefit by being able to purchase products that provide them with "[a] simple but meaningful way to show the world who they are and what they care about." [*Id.*]

The Redbubble Marketplace not only provides a platform through which products can be listed and sold, but the Marketplace software also automatically performs various online services to facilitate the transactions that occur through the Marketplace. In particular, the Marketplace software connects Sellers automatically to third-party manufacturers who print and pack the products before third-party shippers pick up the products and deliver them to customers. [Luthra Decl. ¶ 3 and Deshais Decl. ¶ 3] The platform also provides Sellers access to third-party payment processors who collect and process customer payments. [Luthra Decl. ¶ 4]  This transaction process is entirely Seller-directed and automated by the Redbubble Marketplace software. [Luthra Decl. ¶ 4] Put simply, no Redbubble personnel designed or uploaded, manufactured, offered for sale, sold, handled, distributed, or for that matter even viewed any of the Accused Products prior to OSU identifying them during the course of this lawsuit. [Deshais Decl. ¶ 11]

Currently, there are more than 845,000 independent third-party artists (hereinafter referred to as the "Sellers" or "Third-Party Sellers") offering products for sale via the Redbubble Marketplace. [Cantil-Voorhees Decl. ¶ 2] Purchasers can browse through more than 16 million designs on the Marketplace, and nearly 315 million products bearing these designs are currently offered for sale by these Sellers. [Cantil-Voorhees Decl. ¶ 3]

### B. Redbubble Does Not Design or Upload Content Sold on the Marketplace

Redbubble did not design or upload any of the designs for the Accused Products. Rather, all of the content offered for sale on the Redbubble Marketplace, including those designs displayed on the Accused Products, was designed and uploaded solely by third-party Sellers, without any participation by Redbubble. [Deshais Decl. ¶ 11; Toy Decl. ¶ 17] Redbubble was unaware of the content of those listings prior to their upload, and it had no involvement with the decision to offer the Accused Products. [*See* Luthra Decl. ¶ 9; Toy Decl. ¶ 17]

Before a third-party Seller can upload and sell creative products on the Redbubble Marketplace, he or she must become a registered user. [Luthra Decl. ¶ 5] All registered users are required to comply with the Redbubble User Agreement and various published policies that specify (1) that Sellers using the Marketplace must possess the applicable rights to upload and sell their content on the Marketplace; (2) that the Sellers, not Redbubble, are responsible for such content; and (3) that the third-party artists, not Redbubble, are in fact the sellers of the products offered. [Toy Decl. Exh. C]

A third-party Seller uploading a design to sell through the Redbubble Marketplace has exclusive control over the design and must (among other things) specify the physical product type(s) to which the design may be applied, set the price, and if desired by the Seller, input a title, one or more keyword "tags" and a description. [Luthra Decl. ¶ 7] Potential customers may use the Marketplace software's search function to search for listings containing content of interest to them, and search results are based on these keyword tags and title, which are created solely by the uploading Seller – not Redbubble. [Luthra Decl. ¶ 8]

Once a third-party Seller uploads content (and in doing so affirmatively represents for each design that the Seller has the right to upload the design), the uploaded content generally is

displayed automatically for sale on the Marketplace.[3] [Luthra Decl. ¶ 9] All of the designs for the Accused Products were displayed automatically for sale on the Marketplace following their upload by Sellers, without any knowledge or involvement by Redbubble. [Toy Decl. ¶ 17]

### C.    Redbubble Did Not Sell or Offer to Sell the Accused Products

The agreements between Redbubble and the third-party Sellers using the Redbubble Marketplace platform make clear that it is the third-party Seller, not Redbubble, that offers to sell and sells the products listed on the Marketplace. For example, Redbubble's User Agreement describes how the Redbubble Marketplace enables third-party Sellers "to publish, sell, discuss and purchase art," among other things. There is a section of the User Agreement entitled "Offering your art for sale on a physical product" that describes how a Seller "may offer their art for sale on a physical product on the website by appointing Redbubble to facilitate the transaction…." And there are several references to a Seller offering his/her product for "sale." There is no suggestion in the User Agreement that Redbubble is the seller of the product, or that it offers the product for sale. [*See* Toy Decl. Exh. C]

Similarly, the Redbubble Services Agreement, which is Appendix A to the User Agreement, begins with the statement that "You wish to use Redbubble's services to facilitate marketing and sale of your art on a physical product. . . ." Section 3 of the Services Agreement, entitled "Sale of your products," goes on to provide that the third-party Seller, not Redbubble,

---

[3] As discussed in more detail in Section G below, Redbubble is testing technology that allows Redbubble to pre-screen a small volume of content for potentially infringing user-generated content, but that technology is unproven and has yet to be fully tested.  This technology was not used for the Accused Products. [Toy Decl. ¶ 16]

determines the price for products.[4]  Section 5 of the Services Agreement further confirms that the third-party Seller is in fact "the seller of the merchandise."  [*Id.*]

The listing pages where products are offered for sale further confirm that the products sold via the Marketplace are being offered by third-party Sellers, not Redbubble. As depicted in the listings attached as Exhibit F to the Declaration of Joseph K. Dreitler in Support of Plaintiff's Motion for Summary Judgment ("Dreitler Decl."), each listing on the Redbubble Marketplace contains the Seller's name below the image, followed by a page with the header "More Works by [Seller]" and a selection of additional listings available from that Seller. And some listings additionally contain to the right of the design the title followed by the phrase "by [Seller]". [Luthra Decl. ¶ 10] These pages corroborate what the User Agreement makes clear: all products on the Redbubble Marketplace, including the products accused in this lawsuit, are offered and sold by third-party Sellers, not Redbubble.

The Redbubble Marketplace software facilitates the payment processing of sale proceeds from customers to Sellers (as, for example, Amazon.com does for third-party sellers on the Amazon Marketplace). [Nunn Decl. ¶ 3] More specifically, third party payment processors, like PayPal, Stripe, or Amazon Payments, receive payment directly from customers who purchase products via the Redbubble Marketplace. [Luthra Decl. ¶ 12] That processor forwards the funds directly to Redbubble, which is why Redbubble's name appears on a purchaser's credit card statement. [Nunn Decl. ¶ 2] The Redbubble platform software then automatically facilitates the payment of the Seller-established margin to the Seller's account, while Redbubble retains a fixed

---

[4] Specifically, it provides that a Seller is "able to select any percentage markup you wish, greater than or equal to zero, above the base amount but below the automated upper limit set by Redbubble (subject to change from time to time)." The upper limit is five thousand percent (5000%) over the base amount. [Luthra Decl. ¶ 11]

service fee (which varies by product type) for its facilitation services that is independent of the price set by the Seller. [Nunn Decl. ¶¶ 3 and 4]

It is important to note that Redbubble never took control of or title to the Accused Products. As specified at Section 3.5 of Redbubble's Services Agreement, "[a]ll items purchased from the website are manufactured pursuant to arrangements with third party suppliers under your instructions. This means that title and risk for loss for such items pass from you to the customer/purchaser without passing through us . . . ." [Toy Decl. Exh. C]

### D.    Redbubble Does Not Print or Otherwise Manufacture Products

Once an order is placed, the Redbubble Marketplace software automatically routes the order information to a third-party manufacturer or printer (the "Manufacturer") based on certain criteria, such as location of the customer and the product type ordered. [Luthra Decl. ¶ 13] These Manufacturers are independent of Redbubble; they are neither affiliates of Redbubble nor staffed by Redbubble personnel. [Deshais Decl. ¶ 4] Redbubble does not own the facilities where product is manufactured by these third parties, nor does Redbubble own any of the equipment or employ any of the personnel at those facilities. [Deshais Decl. ¶ 5]

Upon receipt of an order from the Marketplace software, the Manufacturer imprints the design onto the product chosen by the customer, without any input or involvement from Redbubble. [Deshais Decl. ¶ 2] No Redbubble personnel reviewed the artwork for the Accused Products prior to printing. [Deshais Decl. ¶ 11] Nor did any such person participate in the manufacturing process, pack or ship the printed products, perform quality control on the printed products prior to shipment, or for that matter even see the printed products at any time before they were picked up from the Manufacturer by third-party shippers and delivered to the end customers. [Deshais Decl. ¶ 11]

### E. Redbubble Does Not Maintain Inventory of or Ship Finished Products

After a product ordered via the Redbubble Marketplace is manufactured or printed, a third-party shipper picks up the product from the Manufacturer's location and ships the product directly to the customer. [Deshais Decl. ¶ 6] At all times between completion of manufacturing and the time the product is picked up by the shipper, the product remains with the third-party Manufacturer. [Deshais Decl. ¶ 7]

As OSU notes in its Motion, the Redbubble name and logo does appear on the packaging that products are shipped in; the name on the return address label is "An Artist at Redbubble," and the return address itself is Redbubble's.[5] This information is provided because returns and customer service for products sold via the Redbubble Marketplace are handled by Redbubble as a service to Sellers. [Deshais Decl. ¶ 8] At no time during the purchasing process does Redbubble possess or physically handle the finished products. [Deshais Decl. ¶ 9]

### F. Redbubble's So-Called Competitors Utilize a Different Business Model

OSU's Motion papers attempt to assign Redbubble "guilt by association" by repeatedly referencing orders issued against so-called competitors of Redbubble (specifically SunFrog and Skreened). *See* OSU Motion at 1-2, 8-9 and 10-11(citing to various cases filed against "several on-demand printers with the same business model as Redbubble," including Judge Frost's order in *The Ohio State University v. Skreened Ltd.*, 16 F. Supp. 3d 905 (S.D. Ohio 2014) and the district court opinion in *H-D USA, LLC v. SunFrog LLC.*, 311 F. Supp. 1000 (E.D. Wisc. 2018)). However, there are significant differences between Redbubble's business model and the manner

---

[5] As depicted in Exhibit O to the Dreitler Declaration, some garments may also be shipped with a "hang tag" containing the Redbubble logo that is designed to be removed before the garment is worn. However, those hang tags expressly state to the customer that the artwork is "[c]reated just for you by an independent artist" or that the artwork is "by [NAME OF ARTIST]" [Deshais Decl. ¶ 12] Furthermore, neither Redbubble's name nor logo appears on any permanent branding on the garments. [Deshais Decl. ¶ 13]

in which those companies operate, differences that directly impact the legal basis for the courts' decisions in those cases.

Of particular relevance here, while third-party Sellers, not Redbubble, sell the products offered on the Redbubble Marketplace, both SunFrog and Skreened unquestionably sell the products offered via their site directly to customers. *See Skreened* at 908-09, 912-13, 916-17; *Sunfrog* at 1038 ("SunFrog undoubtedly is the seller of the apparel and other items on its website"). And unlike Redbubble, both SunFrog and Skreened manufacture the products sold on their websites and their employees perform the related functions, "including servicing and running the printers, feeding the printers with raw materials . . . , [and] handling and shipping finished products. . . ." *SunFrog* at 1014-15; *see also Skreened* at 908, 919. Their performance of these functions was central to the Court's decision to impose liability for direct infringement on SunFrog and Skreened, and distinguishes those claims from a legal standpoint from OSU's claims against Redbubble. *See SunFrog* at *1036 (pointing that unlike a marketplace like eBay, "because SunFrog advertises and sells infringing products, operates printers that print the products, packs them for shipping, ships them, and then processes payment, it is directly liable"); *Skreened* at 917-19.

### G. Redbubble's Substantial Efforts to Combat Piracy

Like with any marketplace, there is a risk that bad actors will abuse the system by attempting to use it to sell unauthorized or counterfeit products. However, Redbubble has taken significant steps, in excess of its legal obligations, to prevent such abuses, and it continues to direct substantial resources toward eliminating third-party infringement on the Redbubble Marketplace and improving Redbubble's existing anti-piracy measures. [Toy Decl. ¶¶ 5-23, Exhs. C, D; Cantil-Voorhees Decl. ¶¶ 6-10]

*Redbubble Agreements and Policies*. As an initial matter, each registered user agrees to comply with the Redbubble User Agreement and related documents that, among other things, reinforce that "[r]especting other people's intellectual property is an essential principle of Redbubble's community." [Toy Decl. Exh. C] To that end, Redbubble's Sellers must confirm that they own or have all rights to use any uploaded content and that the content "will not infringe the intellectual property rights or any other rights of any person or entity. . . ." [*Id.*] Sellers are further advised that Redbubble will promptly remove infringing listings, and "disable and/or terminate the accounts of users who repeatedly infringe or are repeatedly charged with infringing the . . . rights of others." [*Id.*] Each time they upload listings to the Marketplace, Sellers must also check a box affirmatively acknowledging that they "have the right to sell products containing this artwork, including (1) any featured company's name or logo, (2) any featured person's name or face, and (3) any featured words or images created by someone else." [Luthra Decl. ¶ 6]

Redbubble diligently enforces these rules in accordance with a detailed IP/Publicity Rights Policy, which it publishes on its website. [Toy Decl. ¶ 6, Exh. D] That document begins with the following "mission statement:"

> Redbubble is a community built on respect and recognition of artists. We ask, rather we beg, that you remember this when you are posting work on Redbubble. If you make sure that all the works you upload consist of your very own, original ideas and are not infringing on the intellectual property or publicity rights of another, you will help us foster the supportive and creative environment that is Redbubble. AND, besides being counter to all that Redbubble stands for, stealing other people's work and passing it off as your own is against the law.

[Toy Decl. Exh. D]

The Redbubble IP/Publicity Rights Policy sets forth a "notice and takedown" scheme that largely tracks the provisions of the Digital Millennium Copyright Act, 17 U.S.C. § 512. Boiled down to basics, if a content owner like OSU provides notice that particular listings infringe their

10

intellectual property or publicity rights, Redbubble promptly (*i.e.*, typically within one business day) removes those listings and notifies the third-party Seller who uploaded them. In accordance with that policy, Redbubble will also "disable and/or terminate the accounts of users who repeatedly infringe or are repeatedly charged with infringing the copyrights, trademark rights, other intellectual property rights or publicity rights of others." [Toy Decl. ¶ 7, Exh. D]

Between January 1, 2014 and September 30, 2018, Redbubble received approximately 30,000 takedown requests from content owners, and pursuant to those requests, Redbubble removed approximately 305,000 listings. [Cantil-Voorhees Decl. ¶ 4]

***Redbubble's Proactive Policing Efforts.*** In addition, for certain content owners, Redbubble's 12-person Marketplace Integrity (or "MPI") Team provides further assistance by proactively policing the Redbubble Marketplace for potentially infringing content, using screening criteria established by Redbubble. Such screening criteria are based on information from content owners and almost always are created in collaboration with those content owners. [Toy Decl. ¶ 8] Redbubble performs this proactive screening for OSU, but OSU has refused to cooperate in the process, making implementation of effective screening criteria more difficult. [Toy Decl. ¶ 9]

In Redbubble's proactive policing process, a member of the MPI Team creates a list of search terms that are deemed likely to correspond to potential infringing word marks or listings. [Toy Decl. ¶ 10] This list of search terms is typically based on a list of claimed trademarks and other protected content provided by the content owner, and the content owner sometimes assists in providing common misspellings of its trademarks to make the search keywords more effective. [*Id*.] It is important that the content owner collaborate with Redbubble by providing it with a complete list of what it believes its protected content is, whether that be logos, trademarks,

characters, etc., so that Redbubble can most effectively search for it and remove it from the Marketplace. [Toy Decl. ¶ 11] For content owners like OSU who have refused to cooperate with Redbubble in this process, however, Redbubble is forced to use its best judgment as to what terms a content owner might use to identify colorable infringement. [*Id.*]

The search terms are input into a proprietary software tool, which automatically and continuously monitors for changes in a dynamic database of Seller-generated titles, tags and descriptions in the Redbubble Marketplace, and in near real-time (*i.e.*, approximately one minutes from design upload to detection) displays the results of its searches in a user interface for the MPI Team to review and access. [Luthra Decl. ¶ 14; Toy Decl. ¶ 12] The MPI Team manually reviews these search results, which include images of the artwork for the listing, to identify content that matches the policing guidelines, and is therefore potentially infringing, based on information provided by the content owner. [Toy Decl. ¶ 12] Like the search terms, these guidelines are typically created in collaboration with the content owner, because policing functions most effectively if Redbubble has a full understanding of what designs a content owner considers infringing and how broadly the content owner wishes to enforce any rights it has in such content, in part because various content owners have different approaches to policing, particularly as it relates to fan art, mashups, and artwork that makes critical commentary on the content owner's brand. [Toy Decl. ¶ 13] But if (as in the case of OSU) a content owner refuses to work with Redbubble to create policing guidelines, Redbubble typically attempts to use its best judgment as to what the content owner might consider colorably infringing and therefore might want removed.  [Toy Decl. ¶ 14]

If the policing tool displays user-generated content that matches the content contained in policing guidelines, the MPI Team will promptly remove the listing containing such content

proactively and without receiving a specific takedown notice from the rightsholder. [Toy Decl. ¶ 15] In addition, the third-party Seller is automatically notified upon removal and is otherwise treated in accordance with the IP/Publicity Rights Policy. [*Id.*]

Last year Redbubble began testing a new internally developed tool that allows a small volume of listings to be screened for potentially infringing titles or tags immediately after upload but before they become publicly visible. [Toy Decl. ¶ 16] This tool, which Redbubble refers to as the "ACE" tool, has limitations, because it is keyword based and does not rely on image matching. [*Id.*] Thus, a human must still review each upload prior to removal to determine whether the design matches any of the protected words or images in the policing guidelines created in collaboration with the content owner. [*Id.*] Given the high volume of designs uploaded to the Marketplace, pre-upload screening of all listings may be logistically impractical within a reasonable time frame, as on average over 16,000 listings are uploaded to the Marketplace each day. [Cantil-Voorhees Decl. ¶ 5, Toy Decl. ¶ 17] This technology is still being tested and is under review.[6] [Toy Decl. ¶ 17] And even if Redbubble were able to use this technology to attempt to pre-screen all content uploaded to the Marketplace, it would still need information from content owners regarding what content to remove and the scope of their rights.[7] [*Id.*]

---

[6] Redbubble has also attempted to develop image matching and optical character recognition software. While Redbubble has not yet been able to create a viable scalable solution, and therefore has not used any such application on a significant scale, it continues to work toward such a solution in the hope that its efforts will bear fruit. [Toy Decl. ¶ 19]

[7] As one district court observed in an analogous situation, even a company with the resources of Amazon.com "lacks the ability to analyze every image it receives from third party sellers, compare the submitted image to all other copyrighted images that exist in the world, and determine whether each submitted image infringes someone's copyright interest." *Milo & Gabby, LLC v. Amazon.com, Inc.*, 2015 WL 4394673 at *9 (W.D. Wash. July 16, 2015) *aff'd* 693 F. App'x 879 (Fed. Cir. 2017).

Redbubble also uses a combination of proprietary and third-party software tools that seek to identify scaled and/or repeated abusers of the Redbubble user agreement. [Toy Decl. ¶ 20] For instance, Redbubble uses third-party machine learning software called Sift Science to search for user accounts that are linked to other accounts that have already been restricted or deleted for repeat infringement, as the existence of such accounts might indicate that the applicable Sellers have attempted to circumvent Redbubble Policies by simply creating new accounts. [*Id.*] These tools also look for other Seller behavior that may indicate that a Seller is a scaled abuser or repeat infringer, such as high content upload rates, which might indicate that the user is not a legitimate human artist, but rather a software robot designed to upload content in bulk. [*Id.*] When Sift Science detects a high-risk account, it may automatically disable the account or put it on a watch list to by monitored by the MPI Team.  [Toy Decl. ¶ 21]  When an account is disabled, all listings offered for sale by that account are automatically removed from the Redbubble Marketplace.  [*Id.*]

Redbubble's MPI Team currently conducts proactive policing for marks belonging to OSU and nearly 200 other content owners, including some of the largest content owners in the world, such as Disney, Warner Bros., and Universal Music Group. [Toy Decl. ¶ 22] Many of these companies have a large and diverse portfolio of properties (i.e., copyrights, trademarks and publicity rights), like TV shows and individual movies, and some represent a large roster of musical artists. [*Id.*] In total, Redbubble's MPI team proactively polices for almost 1,400 individual properties for these content owners, and on any given day, the MPI Team may review over 6,000 individual designs and compare them against the policing and removal guidelines established (in the vast majority of cases) in collaboration with these content owners. [Toy Decl. ¶ 22 and Cantil-Voorhees Decl. ¶ 6]

14

To date, the proactive policing efforts of the MPI Team have resulted in the disabling or removal of over 700,000 listings from the Redbubble Marketplace, covering more than 16 million products. [Cantil-Voorhees Decl. ¶ 7] If listings in user accounts disabled by Sift Science are accounted for, then proactive policing efforts to date have resulted in the disabling or removal of approximately 1,700,000 listings from the Redbubble Marketplace, covering approximately 47,200,000 products. [Cantil-Voorhees Decl. ¶ 9][8] And Redbubble has disabled and/or terminated roughly 318,000 Seller accounts for violation of Redbubble policies, including its IP/Publicity Rights Policy.  [Cantil-Voorhees Decl. ¶ 10]

Specifically with respect to OSU, Redbubble has disabled or removed approximately 1,440 listings under its proactive removal guidelines for OSU, covering around 27,500 products. [Cantil-Voorhees Decl. ¶ 8]

### H.    Background of this Dispute

OSU asserts ownership of various trademarks, including the Ohio State Athletic Logo, the Block O, the acronym OSU, the Ohio State football uniforms and stripe patterns, the OSU helmet leaf, the Brutus Buckeye mascot, a particular script Ohio, an O-H-I-O silhouette, and the claimed wordmarks "Ohio State," "Buckeyes," "Scarlet & Gray," and "The Ohio State University." OSU holds federal trademark registrations to many of these marks. OSU also claims rights in the name and persona of OSU football coach Urban Meyer.

On April 12, 2017, an OSU in-house attorney sent a cease and desist letter (apparently by U.S. mail) to Redbubble's Chief Legal Officer, Corina Davis. [Toy Decl. Exh. E] However, the letter did not identify any particular listing that OSU contended was infringing, or identify the

---

[8] These removals were accomplished by detecting and predicting patterns of abuse at the account level, rather than via the MPI Team's manual review of each listing.  [Toy Decl. ¶ 23] Redbubble always strives to increase the scalability of its proactive measures, so it can more efficiently police the Redbubble Marketplace. [*Id.*]

specific marks that OSU believed were being counterfeited. Instead, the letter merely provided links to search results pages for the term "Buckeyes," although many of the listings at those links could not colorably infringe OSU's rights. [*Id.*]

The following are three examples designs with the title or tag "Buckeyes" that were accessible on the Marketplace as of that date:

  

[Cantil-Voorhees Decl. ¶ 11]

In the letter, OSU demanded that Redbubble acknowledge OSU's rights in a series of trademarks it listed; agree to "cease and desist in the production of any and all products bearing the indicia of Ohio State," without specifying those products; pull any remaining stock from inventory and surrender it for disposal; and provide OSU with an accounting "of all Ohio State-themed product sold toward the determination of actual damages." [Toy Decl. Exh. E]

Ms. Davis was out on maternity leave, but on April 20, 2017, Redbubble sent an email response to OSU. [Toy Decl. ¶ 24, Exh. F] In that response, Redbubble advised OSU that it wanted to address OSU's concerns, but noted that OSU had only provided links to dynamic search result pages, which didn't enable Redbubble to determine the particular listings that OSU considered to be infringing. Redbubble therefore asked OSU to specifically identify the designs

it believed were infringing by providing the URLs,[9] and confirmed that it would remove any listings that were so identified. [Toy Decl. Exh. F]

Rather than provide the information requested in this email, on April 25, 2017, OSU's outside counsel, Joseph Dreitler, sent a new letter to Ms. Davis acknowledging Redbubble's reply but refusing to provide the URLs for any infringing designs (although it provided photos of nine designs that OSU asserted were infringing without any other information that would enable Redbubble to locate where among the millions of listings on the Redbubble Marketplace those listings might be found). [Toy Decl. ¶ 26, Exh. G] OSU concluded by stating its "legal position that it is not Ohio State's responsibility to police [Redbubble's] website to identify and request removal" of infringing items, and demanded that Redbubble agree to this position by the close of business on April 28. [*Id*.]

The next day, Redbubble sent a reply to Mr. Dreitler offering additional assistance to OSU in removing content it found objectionable. [Toy Decl. ¶ 27, Exh. H] In that reply (which OSU referenced but did not attach to the Dreitler Declaration)[10], Redbubble advised OSU that if it was less burdensome for OSU to identify the designs appearing on the search results pages that OSU did *not* consider infringing, Redbubble could remove the remaining designs on those pages. [*Id*.] OSU ignored this offer as well. [Toy Decl. Exh. H]

---

[9] A listing's URL is a direct link to the design that a content owner considers infringing and would like removed. With the URL or an item number, it is a simple matter to find and remove a listing; this can be done in a matter of minutes. When a content owner like OSU provides a copy of a design without the URL or item number, however, moderation is difficult because Redbubble does not have image matching technology and therefore cannot directly find listings with just an image. And if the content owner has found a potentially infringing design on the Redbubble Marketplace, then that content owner presumably also has a URL and/or item number. Providing that information dramatically simplifies the process of identifying and removing potentially infringing designs. [Toy Decl. ¶ 25]

[10] It appears that Mr. Dreitler attached an initial auto-response to his Declaration, rather than the more substantive response in Toy Exhibit H.

On December 14, 2017, some eight months after the last correspondence, and without ever having specifically identified any of the listings that OSU contended were infringing, OSU filed the instant case against Redbubble. [Toy Decl. ¶ 28] OSU's Complaint asserts claims for direct trademark infringement, unfair competition and counterfeiting under the federal Lanham Act, and a state law claim for violation of the right of publicity of Urban Meyer, OSU's football coach.

Promptly upon receiving notice of the lawsuit, Redbubble endeavored to remove any listings containing the images identified in the Complaint or the trademarks attached to the Complaint, although OSU still did not attach the listings it was concerned about or attach the URLs for those listings. [Toy Decl. ¶¶ 28-29] On February 1, 2018, in a further effort to address the concerns identified by OSU in the lawsuit, Redbubble sent OSU a spreadsheet showing the Sellers' names and contact information and providing sales for each listing that Redbubble had moderated for OSU, either in response to OSU's identification of allegedly infringing products in the Complaint or via proactive policing. (Wilson Decl. ¶ 4) In that letter, Redbubble also offered to work with OSU on criteria for proactively policing the Marketplace on an ongoing basis. [*Id.*] OSU refused to respond to this offer, leaving Redbubble to unilaterally establish proactive policing criteria without OSU's assistance or input. [Wilson Decl. ¶ 4 and Toy Decl. ¶ 29]

## I.     OSU's Purported Post-Filing Purchases

OSU points to its identification of four allegedly infringing items (three stickers and a T-shirt) in the nine months since this lawsuit was filed as evidence that Redbubble is intentionally disregarding OSU's trademark rights. While these purchases reveal some inherent limitations with the Redbubble's proactive policing system, limitations that Redbubble has been actively working to resolve, they are irrelevant to the fundamental question posed by this motion, namely whether ***Redbubble used*** OSU trademarks in commerce. Nonetheless, Redbubble feels

compelled to provide a brief explanation of these incidents to defuse any concerns the Court might have about Redbubble's treatment of these incidents.

With respect to the first post-lawsuit incident, OSU purchased three allegedly infringing stickers on April 23, 2018. [Dreitler Decl., ¶ 11, Exh. L] Unfortunately, at that time, Redbubble had no technically feasible way to proactively police listings for all complainants ***prior to their posting*** by third-parties to the Redbubble Marketplace. [Toy Decl. ¶ 30] As previously noted, because uploads are not pre-screened prior to upload, and Redbubble was still in the process of testing and expanding the use of the ACE tool, products could be offered for sale by Sellers during the short period between the time they were uploaded and the time they were discovered by Redbubble's MPI Team. [Toy Decl. ¶ 30] Nonetheless, Redbubble identified and removed each of these three listings through its own proactive policing, within 72 hours of their upload by a third-party Seller and weeks before OSU identified them to Redbubble in the context of a May 17, 2018 settlement demand letter. [11] [Cantil-Voorhees Decl. ¶ 12; Wilson Decl. ¶¶ 5-6] Improvements in the ACE tool, which is now being used for OSU-related content, should effectively and automatically prevent designs uploaded with certain keywords in the title or tags from slipping through the proactive screens in the future. [Toy Decl. ¶¶ 16-18]

These listings highlight another difficulty Redbubble faces when a content owner like OSU refused to cooperate in the proactive policing process. Two of the three stickers purchased post-lawsuit by OSU were transformative "mashups" of the OSU logo with pop culture icons (the Rolling Stones tongue and the Grateful Dead skull). It is unclear whether these transformative mashups are infringing, or whether they are legitimate parodies or otherwise

---

[11] Redbubble's records show that the seller uploaded the design for the product shown in Exhibit O on May 23, 2018. During the three months between the upload and the time OSU provided an image of the design in its August 15 Motion (at which time Redbubble promptly removed it), there was a single sale of this design (aside from OSU's purchase), on a single sticker, with a retail sale price of $1 AUD (or about $0.75 USD). That additional purchase was made on June 17, 2018, sixteen days after Mr. Dreitler says that OSU made its purchase. Had OSU promptly notified Redbubble of the alleged infringement, given Redbubble's policy and practice of promptly removing listings upon receiving notice from a content owner, that purchase likely would have been prevented. [Cantil-Voorhees Decl. ¶¶ 16-17]

appropriate exercises of the artists' First Amendment rights.[12] [Toy Decl. ¶ 31] And neither the mashup stickers nor the T-shirt design had been identified by OSU in its previous correspondence as infringing content. [*Id.*] While Redbubble unilaterally removed all three of these listings out of an abundance of caution, this particular example highlights the tension between an artist's right to expression and a content owner's right to protect its intellectual property, and more importantly, the difficulty that a marketplace like Redbubble has in resolving this tension, particularly absent the cooperation of the content owner. [*Id.*]

Finally, with respect to the second post-filing incident, on June 1, 2018, OSU purchased a T-shirt containing the "O-H-I-O" cheer logo, but did not disclose this purchase to Redbubble until this motion was filed in mid-August. Redbubble did not find this design during its proactive policing for OSU marks because the third-party Seller did not use any OSU trademarks in the title or tags when the Seller uploaded the design (the design was entitled "Ohio", and the tags were "one dollar shirt father grandpa usa american ride gift suggestion ohio"). [Cantil-Voorhees Decl. ¶ 14] As a result, the design was not caught by Redbubble's text-based proactive policing process.[13] [*Id.*] However, it is highly unlikely that users looking to purchase OSU-related content would find this or other designs if they are not uploaded with OSU-related tags. [Cantil-Voorhees Decl. ¶ 15] In fact, in the roughly three months between the time the Seller uploaded the design (on May 23, 2018) and the time Redbubble removed it in response to OSU's identification of the design in its August 15 Motion, there was a single sale of this design (aside from OSU's purchase), on a single sticker, with a retail sale price of $1 AUD (or about $0.75 USD). [Cantil-Voorhees Decl. ¶ 16] And that purchase was made roughly three weeks after OSU

---

[12] *See, e.g., University of Alabama Bd. of Trustees vs. New Art Life, Inc.*, 683 F.3d 1266 (11th Cir. 2012) (paintings, prints, calendars and mugs incorporating realistic portrayals of the University of Alabama's trademarked football uniforms were protected by the First Amendment and therefore did not violate the Lanham Act); *ETW Corp. v. Jireh Publishing, Inc.*, 332 F.3d 915, 924-38 (6th Cir. 2003) (discussing applicability of the First Amendment to Lanham Act and Ohio state law right of publicity claims); *Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F. 2d 316 (4th Cir. 1992) (T-shirt design containing the Budweiser can and label mashuped up with elements of the Myrtle Beach tourist scene could qualify as a parody).

[13] As previously noted, Redbubble lacks image matching technology that would enable it to locate and remove allegedly infringing designs based solely on the artwork. [Toy Decl. ¶ 19]

made its purchase; in other words, had OSU promptly notified Redbubble of the alleged infringement, that purchase would have been prevented. [Cantil-Voorhees Decl. ¶ 17]

## ARGUMENT

I. **THE UNDISPUTED FACTS ESTABLISH THAT REDBUBBLE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON EACH COUNT OF OSU'S COMPLAINT**

OSU has asserted three claims under the federal Lanham Act based on Redbubble's alleged use in commerce of OSU trademarks: 1) trademark infringement; 2) passing off and unfair competition, the elements of which are identical to those for a trademark infringement claim; and 3) trademark counterfeiting, which OSU correctly describes as "the most extreme form of trademark infringement." [OSU Motion at 13] OSU has also asserted a claim against Redbubble for purportedly using images of Urban Meyer in violation of his right of publicity, which he apparently assigned to OSU.

The undisputed facts demonstrate as a matter of law that OSU has failed to establish that Redbubble has made any "use," let alone a trademark use, of the marks at issue. Surprisingly, although Redbubble has repeatedly advised OSU that Redbubble intended to rely on lack of use as a primary defense in this action, OSU barely references the issue in its motion. OSU's inability to establish this core element, as set forth in more detail below, is fatal to each of its claims for relief, and compels entry of summary judgment in Redbubble's favor on OSU's Complaint.

### A. First Count for Direct Trademark Infringement

The Lanham Act imposes liability for trademark infringement on "[a]ny person who shall, without the consent of the registrant:"

> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for

sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive[.]

15 U.S.C. § 1114(1).

Redbubble is entitled to a determination on OSU's First Count for direct trademark infringement as a matter of law, since OSU has not established and cannot establish that Redbubble used the marks at issue in commerce.[14] As OSU correctly noted at page 13 of its Motion, a trademark infringement plaintiff bears the burden of showing, among other things, that "the defendant used the mark in commerce." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009). While selling an infringing product may give rise to liability, "it is clear that 'a transactional intermediary is not treated as a seller,' that is, 'parties [who] act as intermediaries for a transaction and do not buy and resell the commodities' are not direct sellers and are not directly liable for infringement under the [Lanham Act]." *Tre Milano, LLC v. Amazon.com, Inc.*, No. B234753, 2012 WL 3594380 (Cal. App. 2012) (quoting *GMA Accessories, Inc. v. BOP, LLC*, 765 F. Supp. 2d 457, 464 (S.D.N.Y. 2011)).

---

[14] This is an action for ***direct*** trademark infringement only. OSU's Complaint makes that clear, as it only sets forth the elements of a claim for direct trademark infringement; it contains none of the allegations required for a claim of contributory trademark infringement (*i.e.*, knowledge of specific infringement by a third-party using Redbubble's services and failure to act) or vicarious trademark infringement, to the extent that such a claim is even cognizable in this Circuit. *See, e.g., Tovey v. Nike, Inc.*, 2013 U.S. Dist. LEXIS 16084 (N.D. Ohio February 6, 2013) ("Tovey II") (citations omitted) ("vicarious trademark liability is a cause of action . . . not yet recognized in the Sixth Circuit"). At page 29 of OSU's Motion, OSU further confirms that this is only a direct infringement case, dismissing certain Redbubble affirmative defenses as "irrelevant to this case of trademark counterfeiting and direct infringement."

Indeed, to date, courts have consistently held that intermediaries or "online marketplaces" like Redbubble are not deemed "sellers" and do not otherwise "use" the marks sold on their sites for purposes of trademark law. *See, e.g., Bird v. Parsons*, 289 F. 3d 865 (6th Cir. 2002) ("The possibility that [Defendant's] customers might buy or sell infringing domain names [using Defendant's Internet auction site] does not alter the fact that [Defendant] does not use those names"); *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F. 3d 93, 103 (2nd Cir. 2010) (affirming a finding of no direct trademark infringement after noting that eBay never took possession of items sold through its marketplace and did not directly sell allegedly infringing products to customers); *Milo & Gabby, LLC v. Amazon.com, Inc.*, 2015 WL 4394673 (W.D. Wash. July 16, 2015) *aff'd* 693 F. App'x 879 (Fed. Cir. 2017) (granting summary judgment that Amazon.com is not liable for direct trademark infringement based on sale of products listed by third parties on its site); *Tre Milano, LLC v. Amazon.com, Inc.*, *supra* (holding that Amazon was not liable for direct infringement because it was not a seller of the accused products).

The cases involving the Amazon Marketplace are particularly relevant here, since Amazon plays a similar (and in some ways a more active) role in the operation of its marketplace to Redbubble. For example, in *Milo & Gabby*, *supra,* the Court described the Amazon Marketplace as "a widely used internet service retail website" that "enables third-party vendors to sell and distribute a variety of products to the public, while Amazon 'fulfills' the orders." *Milo & Gabby*, 2015 WL 4394673 at *1. The Court went on to describe the process of listing the product for sale using language that could as easily apply to Redbubble:

> When a third-party seller wants to offer a new product for sale on the Amazon.com platform, the third-party seller is responsible for sending Amazon, via an automated file upload system, content related to the new product, such as a product description, an image of the product, and the product's price. This content is used to automatically generate a 'product detail page' and, in some instances, to create advertisements related to the

23

> new product. The third-party seller is responsible for the uploaded content, and specifically represents and warrants that it has the right to grant Amazon a license to use all content, trademarks, and other materials provided by it. Under Amazon's Intellectual Property Violations Policy, third-party sellers are responsible for ensuring that the products they offer for sale are legal. With respect to images, third-party sellers agree that it is their responsibility to 'ensure that [they] have all necessary rights for the images [they] submit.

*Id.* at 2.

The plaintiffs in *Milo & Gabby* argued that Amazon should nonetheless be held liable for direct trademark infringement as the "real seller" of the products at issue, asserting that "(1) the "products are advertised on the amazon.com domain"; (2) "[p]ayment is made directly to Amazon"; (3) "Amazon issues the invoice and tracking information"; (4) "Amazon ships the products in a box that bears the `Amazon' logo"; and (5) "Amazon broadcasts email advertisements from its own account (not the manufacturer's) offering the knockoff." *Id.* In addition, there was no dispute that (unlike Redbubble) Amazon itself provided "fulfillment services for the products, such as storage and shipping." *Id.*

The district court rejected plaintiffs' arguments and granted summary judgment in favor of Amazon on the direct trademark infringement claim. In doing so, the court reasoned that "third-party sellers retain full title to and ownership of the inventory sold by the third party. Plaintiffs have provided no evidence to the contrary with respect to any specific third party involved with the products in this case. Accordingly, the Court concludes that Amazon was not the seller of the products at issue here." *Id.* at 6. *See also Milo & Gabby, LLC v. Amazon.com, Inc.*, 693 F. App'x 879 (Fed. Cir. 2017) (Federal Circuit noted that "Amazon did not directly sell" the allegedly infringing product, and held that Amazon could not be deemed a seller for purposes of copyright infringement, even though the accused product was shipped "to an Amazon warehouse for storage and Amazon boxed up and shipped the product when a sale was

consummated on the website" because "Amazon never held title to the accused products").

The California Court of Appeal reached a similar conclusion in affirming the denial of a preliminary injunction in *Tre Milano, LLC v. Amazon.com, Inc.*, *supra*. There, the Court noted in addition to hosting third-party product sales, Amazon sold its own products on its Marketplace (although those products were not at issue); Amazon provided product descriptions and, in some instances, a generic photograph of the item; all payments were handled through Amazon; and some products were stored and shipped by Amazon. Nonetheless, the Court of Appeal held that Amazon was not a direct trademark infringer, explaining that "Amazon is a service provider, not the seller. Amazon did not currently have any [accused products] in its own inventory; those it sold belonged to third party sellers. That Amazon provided the product description and handled the payments did not make it a direct seller of the products." 2012 WL 3594380 at *12.

Like the Amazon Marketplace, the Redbubble Marketplace provides a platform where third-party Sellers upload their listings. [Toy Decl. ¶ 17] Like the Amazon Marketplace, the Redbubble Marketplace platform then automatically generates the listing page, without Redbubble's active involvement. [*See, e.g.*, Luthra Decl. ¶ 9; Toy Decl. ¶ 7] Like Amazon, Redbubble requires Sellers to represent that they have all necessary rights in the products they are selling, and that they are not infringing third-party intellectual property rights. [*See, e.g.*, Toy Decl. Exh. C; Luthra Decl. ¶ 6] Like Amazon, Redbubble performs various services to facilitate the functioning of the Marketplace, including payment processing, and charges a fee for those services. [Luthra Decl. ¶ ¶ 2 and 4)  Like Amazon, Redbubble does not make the products offered for sale on its Marketplace, including specifically the Accused Products in this lawsuit. [Deshais Decl. ¶ 11] And like Amazon, Redbubble does not sell or offer to sell such products; all sales and offers for sales are made by third-party Sellers. [Toy Decl. ¶ 17] Indeed, Redbubble

makes even less "use" of trademarks in products sold via its Marketplace than Amazon, because unlike Amazon, Redbubble doesn't store any inventory of the third-party Seller's products or pack or ship such products. [Deshais Decl. ¶¶ 6 and 7) Thus, as the Amazon cases make clear, Redbubble did not sell or otherwise "use" the OSU trademarks at issue in this case, and therefore cannot be liable for direct infringement as a matter of law.

While OSU repeatedly makes conclusory statements to the effect that Redbubble "has offered to sell, and has manufactured, sold, shipped and continued to sell" infringing products, just saying it doesn't make it so. OSU has not offered and cannot offer any evidence that would create a triable issue of fact that Redbubble has used the trademarks at issue. Stripping aside OSU's self-serving characterizations, the evidence submitted by OSU in its Motion shows merely that OSU found listings that it contends infringe its trademark rights on the Redbubble Marketplace; that OSU purchased products that it contends infringe its trademark rights on the Redbubble Marketplace (although OSU did not attach the listings for the products that it purchased); that Redbubble's name appeared on the credit card statements for those purchases; and that products were shipped to OSU in packaging bearing Redbubble's branding, and one instance contained a temporary, removable hang tag with Redbubble's logo. [*See* Dreitler Decl. ¶¶ 6-12, Exhs. C-Q] None of this evidence creates a triable issue regarding Redbubble's core showing, supported by ample evidence, that Redbubble (as opposed to third-party Sellers and fulfillers) did not design, upload, make, offer for sale or sell the accused products.

A determination in favor of Redbubble in this case would be wholly consistent with the summary judgment ruling in *Ohio State University v. Skreened Ltd.*, 16 F. Supp. 3d 905 (S.D.

Ohio 2014), a case on which OSU heavily relies in its motion.[15] As Judge Frost expressly noted in his opinion, and unlike Redbubble, the defendant there ***did not dispute*** "whether Defendants used trademarks 'in commerce' and without Plaintiff's authorization and whether Defendants used the trademark (or an imitation of it) 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services." 16 F. Supp. 3d at 916. And the defendants in that case expressly confirmed that they printed the items in question. *See, e.g., id.* at 908. In contrast, Redbubble has established that, unlike Skreened, Redbubble did not make or sell the Accused Products, or otherwise use the accused marks. As a result, the *Skreened* opinion is inapplicable to the case at hand.

A decision in favor of Redbubble would also be consistent with the district court's ruling in *H-D U.S.A., LLC v. SunFrog LLC*, 311 F. Supp. 3d 1000 (E.D. Wisc. 2018), which OSU discusses in detail in its motion. In that case, there was no dispute that, unlike Redbubble, SunFrog offered for sale and sold the infringing products; it printed the infringing products on machines that it owned and operated; and its employees handled the products as they came off of the printers, bagged and shipped them. *Id.* at pp. 40-42. Given this level of involvement, the Court correctly concluded that "because SunFrog advertises and sells infringing products, operates printers that print the products, packs them for shipping, ships them, and then processes payment, it is directly liable." *Id.* at p. 54. Indeed, the district court in *SunFrog* expressly distinguished SunFrog from a lawful marketplace like eBay, Amazon or Redbubble, citing to the *Milo & Gabby v. Amazon* and *Tre Milano v. Amazon* opinions, and highlighting the same

---

[15] Although OSU asserts that since the *Skreened* decision it "has successfully sued several of Defendant's competitors," a review of the dockets in those cases reveals that while the parties in two of the three cases entered into Stipulated Consent Decrees and Permanent Injunctions (perhaps because they lacked the resources to fight), OSU did not obtain any favorable rulings on the merits in contested proceedings in any of those cases.

differences between the business models on which Redbubble is relying. *Id.* at pp. 54-55.

Because the evidence of record establishes beyond question that Redbubble did not engage in any conduct that could subject it to liability for direct trademark infringement, OSU's First Count for direct infringement fails as a matter of law, and judgment should be entered in favor of Redbubble on this claim.

### B. Second Count for Lanham Act Unfair Competition

As noted at page 13 of OSU's Motion, the elements of OSU's federal unfair competition claim are essentially the same as those for its direct trademark infringement claim. *See Victoria's Secret Stores v. Artco Equip. Co.*, 194 F. Supp. 2d 704, 724, fn. 8 (S.D. Ohio 2002) ("the same analysis applies" to federal trademark infringement claims and Lanham Act unfair competition or passing off claims). Accordingly, and for the same reason Redbubble is entitled to judgment in its favor on the trademark infringement claim, Redbubble is equally entitled to summary judgment on this claim as well.

### C. Third Count for Counterfeiting

A Lanham Act counterfeiting claim is a narrow claim that exceeds the requirements for an ordinary trademark infringement claim. Specifically, a counterfeiting plaintiff must plead and prove that a defendant not only infringed plaintiff's trademark, but (1) sold products with a "counterfeit" of the mark (i.e., "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark"), and (2) "intentionally used the mark knowing it was a counterfeit." *Too, Inc. v. TJX Cos.*, 229 F. Supp. 2d 825, 837 (S.D. Ohio 2002). OSU has failed to offer evidence sufficient to establish either of these elements.

As an initial matter, as OSU acknowledges at pages 13-14 of its Motion, trademark counterfeiting, like trademark infringement, requires that a defendant "use" the mark in commerce. *See also* 15 U.S.C. § 1114 (counterfeiting liability attaches to any person "who shall,

28

without the consent of the registrant, use in commerce" any counterfeit mark). As a result, for the same reasons Redbubble cannot be found to have "used" OSU's trademarks, Redbubble also cannot be found to have "used" counterfeits of those trademarks, and summary judgment in favor of Redbubble on this claim is appropriate.

Moreover, counterfeiting is "the act of producing or selling a product with a sham trademark that is an intentional and calculated reproduction of the genuine trademark." *Too*, 229 F. Supp. 2d at 837. Thus, to prevail on its counterfeiting claim, OSU would need to establish not only the elements of trademark infringement, but also that Redbubble **intentionally** used a counterfeit of an OSU mark while "knowing it was a counterfeit." *Id.*

OSU has not demonstrated and cannot demonstrate that Redbubble made or sold a product "that is an intentional and calculated reproduction of the genuine trademark." To the contrary, as Redbubble has established, Redbubble is generally not aware of specific designs uploaded and listed for sale by third-party Sellers on the Marketplace, including specifically the designs for the Accused Products. [Toy Decl. ¶¶ 17, 30] Similarly, Redbubble didn't make the Accused Products, or even see those products at any point during the manufacturing, sale and shipping process. [Deshais Decl. ¶ 11] While Redbubble asked OSU to provide URLs for the listings that OSU contended were infringing to assist Redbubble in identifying, locating and removing allegedly infringing content, OSU refused to provide that information. [*See, e.g.*, Toy Decl. ¶ 28] Whenever Redbubble became aware of allegedly infringing content, Redbubble promptly removed it. [Toy Decl. ¶ 29] And Redbubble has implemented numerous proactive measures to prevent content that OSU might consider infringing from being offered for sale on the Redbubble Marketplace, despite OSU's unwillingness to cooperate with that process. [Toy Decl. ¶ 8-21]

Under the totality of the circumstances, even in the unlikely event that Redbubble could be found to have "used" OSU's trademarks, no reasonable trier of fact could conclude that Redbubble has "intentionally" made or sold any product "knowing it was a counterfeit" of an OSU trademark. This constitutes a separate basis for denying OSU's Motion for Summary Judgment on the Third Count for Counterfeiting.[16]

### D. Redbubble Is Entitled to Judgment in Its Favor on OSU's Fourth Count for Violation of Right of Publicity Under O.R.C. Chapter 2741

OSU summarily asserts that Redbubble is liable for violation of Urban Meyer's right of publicity, without so much as setting forth the elements of that cause of action. However, the elements of a statutory right of publicity claim apply on their face only to someone who "uses" the plaintiff's persona for a commercial purpose. Moreover, ORC § 2741.02(E) sets forth an exception for intermediaries like Redbubble "by whom any advertisement or solicitation in violation of this section is published or disseminated" unless it is established that the defendant "had knowledge of the unauthorized use of the persona."

Here, the undisputed facts establish that Redbubble is not liable under OSU's right of publicity claim for at least three reasons: 1) Redbubble did not itself "use" Mr. Meyer's persona for a commercial purpose, as any such use was by third-party Sellers using the Redbubble Marketplace; 2) in the event that Redbubble were somehow deemed to have "used" Mr. Meyer's persona, Redbubble would be immune as an intermediary that did not have knowledge of the specific unauthorized uses in question; and 3) Redbubble is immunized from liability under Section 230 of the Communications Decency Act.

#### 1. Redbubble Is Not Liable Because It Did Not Use Mr. Meyer's Persona

As with the trademark-based claims, Redbubble has not violated Mr. Meyer's right of

---

[16] These same arguments apply with equal force to OSU's claim that Redbubble has engaged in willful trademark infringement in its First Count for direct trademark infringement.

publicity as a matter of law because Redbubble has not "used" Mr. Meyer's persona. The "use" requirement is expressly set forth in ORC § 2741.02(A), which provides that "a person shall not use any aspect of an individual's persona for a commercial purpose."

"There is a paucity of precedent in Ohio regarding" the statutory right of publicity claim. *Roe v. Amazon. com*, 170 F. Supp. 3d 102 (S.D. Ohio 2016). As a result, there appears to be no case law specifically interpreting the term "use" in Section 2741 et seq. However, other courts considering similar right of publicity claims have determined that "use" should carry its ordinary meaning, requiring that a defendant must take affirmative steps to specifically exploit the persona in question. *See, e.g., Cross v. Facebook, Inc.*, 14 Cal. App. 5th 190, 208 (2017) ("Both [California] Civil Code section 3344 and the common law require that Facebook 'use[ ]' the plaintiff's identity"); *Perfect 10, Inc. v. Google, Inc*., Case No. CV 04-9484 AHM (SHx)) 2010 WL 9479060, p. *13 (C.D.Cal., July 30, 2010), *aff'd* 653 F.3d 976 (9th Cir. 2011) ("a plaintiff must show that *the defendant* appropriated the plaintiff's name or likeness for commercial purposes") (emphasis in original); *Doe ex rel. Roe v. Backpage.com, LLC*, 104 F. Supp. 3d 149 (D. Mass. 2015) (quoting *Tropeano v. Atl. Monthly Co*., 379 Mass. 745, 749, 400 N.E.2d 847 (1980)) (drawing distinction between non-actionable "situations in which the defendant makes an incidental use of the plaintiff's name, portrait or picture" (i.e., providing on line classifieds forum on which third parties pay for ads used to promote sex trafficking of children), and "those in which the defendant uses the plaintiff's name, portrait or picture deliberately to exploit its value for advertising or trade purposes," which may serve as the basis for liability).

More specifically, courts have held that a service provider like Redbubble cannot be held liable for a right of publicity claim based on content uploaded by a third party. *See, e.g., Cross, supra* (Facebook did not assume liability by placing ads next to third party postings on Facebook

that violated plaintiff's right of publicity); *Perfect 10, supra* (Google did not "use" the likeness of models whose images were uploaded by third parties to a blogging service hosted by Google); *Almeida v. Amazon. com, Inc*., 456 F. 3d 1316 (11th Cir. 2006) (Amazon.com did not make the requisite "use" of plaintiff's likeness under Florida's right of publicity by providing a product detail page that displays the cover of each book offered for sale, as well as text describing the book, since the book's author provided the original content).

    As set forth in detail above in the context of OSU's trademark infringement claims, Redbubble has not made any use of Mr. Meyer's persona. At most, the evidence of record suggests that it may have received a service fee as a result of third party uses of Mr. Meyer's persona. As a matter of law, such incidental use is insufficient to support a claim under ORC § 2741 for violating Mr. Meyer's right of publicity, and warrants entry of summary judgment in Redbubble's favor on this claim.

### 2.    Redbubble Is Not Liable Because It Was an Intermediary

    ORC § 2741.02(E) provides that "[t]he owners or employees of any medium used for advertising, including but not limited to, a newspaper, magazine, radio or television network or station, cable television system, billboard, transit ad, and global communications network, by whom any advertisement or solicitation in violation of this section is published or disseminated are not liable under this section or section 2741.07 of the Revised Code unless it is established that those owners or employees had knowledge of the unauthorized use of the persona."

    The Redbubble Marketplace qualifies as a "medium used for advertising" for purposes of the statute.  Specifically, as discussed in detail previously, Redbubble's platform is a "global communications network" that enables third-party Sellers to "list" (i.e., advertise) their products for sale, much like the other examples listed in the statute.

The district court's opinion in *Skreened* does not compel a contrary conclusion. There, the court determined based on the testimony of Skreened's owners that Skreened was "simply in the business of printing apparel, without mentioning being in the advertising business or serving as a provider of any sort." In contrast, Redbubble is a "provider" of access to a Marketplace, and allows third-party Sellers the capability to advertise through their use of that Marketplace

As previously discussed, no Redbubble personnel had knowledge of specific designs uploaded and listed for sale by third-party Sellers on the Marketplace, including designs that may have featured the persona of Mr. Meyer, nor did they have knowledge of the use of his persona on specific finished products prior to the filing of this lawsuit. [Toy Decl. ¶¶ 24-28] Accordingly, Redbubble is entitled to the statutory exemption of ORC § 2741.02(E) as a matter of law, and summary judgment in favor of Redbubble is therefore appropriate.

> 3.    Redbubble Is Immune from OSU's State Law Right of Publicity Claim as an Interactive Computer Service Under Section 230 of the Communications Decency Act.

Redbubble is immune from suit on Plaintiff's state law right of publicity claim based on Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230, which specifies that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). "Section 230 bars a claim if (1) the defendant asserting immunity is an interactive computer service provider, (2) the particular information at issue was provided by another information content provider, and (3) the claim seeks to treat the defendant as a publisher or speaker of that information." *Jones v. Dirty World Entertainment Recordings, LLC*, 755 F.3d 398, 409 (6th Cir. 2014). On the other hand, "a defendant is not entitled to protection for claims based on the publication of information if the defendant is 'responsible, in whole or in part, for the creation or development of the information.'" *Id.* at 406-07 (quoting 47 U.S.C. § 230(f)(3)).

"The majority of federal circuits have interpreted the CDA to establish broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'" *Perfect 10, Inc. v. Ccbill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) (citing to, among others, *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006), and *Zeran v. America Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997)); *see also Jones, supra* ("Although § 230(c)(1) does not explicitly mention immunity or a synonym thereof, this and other circuits have recognized the provision to protect internet service providers for the display of content created by someone else.").

With respect to right of publicity claims in particular, the only federal appellate court to directly rule on this issue has specifically held that the CDA immunizes an interactive computer service from right of publicity claims. *See, e.g., Perfect 10, supra*, 488 F.3d at 1119 (expressly holding that right of publicity claims against online service providers are barred under the CDA, and reversing district court decision to the contrary). Other courts have followed suit. *See, e.g., Perfect 10, Inc. v. Giganews, Inc.*, 2013 WL 2109963, at *15-16 (C.D. Cal. Mar. 8, 2013) (finding claims against service providers for violation of publicity rights under California law barred by Section 230); *Almeida v. Amazon.com, Inc.*, 2004 WL 4910036, at *4 (S.D. Fla. 2004) (holding Section 230 barred Florida right of publicity claim), *aff'd on other grounds, Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006).

Although Judge Frost concluded in dicta in *Skreened* that Section 230 would not apply to a right of publicity claim under Ohio law, Redbubble respectfully submits that his conclusion was erroneous and should not be followed by this Court. After holding that the defendants in *Skreened* had waived a Section 230 defense because they failed to plead it, Judge Frost explained that "even if Defendants had not forfeited reliance on § 230, they ignore the fact that its

34

immunity provision does not apply in the trademark context or in the context of a state law right of publicity claim." While the court did not provide any reasoning for its decision other that a string of statutory and case citations and parentheticals, it appears that the court assumed that right of publicity claims are state intellectual property claims, and that such claims are exempted from CDA immunity under Section 230(e)(2), which states that "[n]othing in this section shall be construed to limit or expand any law pertaining to intellectual property." However, this reasoning has been rejected by the Ninth Circuit, the only Circuit court to expressly decide whether state intellectual property claims are covered under Section 230(e)(2).

As the Ninth Circuit explained in *Perfect 10, supra*, interpreting the intellectual property exemption of Section 230(e)(2) to include state intellectual property claims is contrary to the CDA statutory scheme:

> While the scope of federal intellectual property law is relatively well-established, state laws protecting "intellectual property," however defined, are by no means uniform. Such laws may bear various names, provide for varying causes of action and remedies, and have varying purposes and policy goals. Because material on a website may be viewed across the Internet, and thus in more than one state at a time, permitting the reach of any particular state's definition of intellectual property to dictate the contours of this federal immunity would be contrary to Congress's expressed goal of insulating the development of the Internet from the various state law regimes.

488 F.3d at 1118-19 (citations omitted). The Court further reasoned that "defendants that are otherwise entitled to CDA immunity will usually be subject to the law of numerous states. An entity otherwise entitled to § 230 immunity would thus be forced to bear the costs of litigation under a wide variety of state statutes that could arguably be classified as 'intellectual property.' As a practical matter, inclusion of rights protected by state law within the 'intellectual property' exemption would fatally undermine the broad grant of immunity provided by the CDA. *Id.* at 1119 n. 5. (quoting *Zeran, supra*, 129 F.3d at 330)).

Consistent with the Ninth Circuit ruling in *Perfect 10*, the Sixth Circuit has held that the immunity provisions in Section 230 should be construed broadly, and that "close cases must be resolved in favor of immunity, lest we cut the heart out of section 230 by forcing websites to face death by ten thousand duck-bites, fighting off claims that they promised or encouraged – or at least tacitly assented to – the illegality of third parties." *Jones, supra,* 755 F.3d at 408.

Here, as discussed above, the undisputed facts demonstrate that Redbubble is not responsible for the creation or development of the content offered for sale on the Redbubble Marketplace, and that each of the three elements of Section 230 immunity are satisfied. This constitutes a second basis for granting summary judgment to Redbubble on OSU's right of publicity claim.

a.      Redbubble is an interactive computer service

An "interactive computer service" is defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2). The undisputed facts demonstrate, and OSU concedes, that the Redbubble platform allows "third parties [to] upload designs to RedBubble's [sic] public website" [OSU Motion at p. 2; Toy Decl. ¶ 17] Accordingly, Redbubble clearly satisfies this first prong of the Section 230 immunity test. *See Jones, supra* (holding that a web site that did not author defamatory statements but did select them for publication on the site still qualified as an interactive software provider); *Oberdorf v. Amazon.com, Inc.*, 295 F. Supp. 3d 496 (M.D. Pa. 2017) (noting that "[t]he Amazon Marketplace serves as a sort of newspaper classified ad section, connecting potential consumers with eager sellers in an efficient, modern, streamlined manner" and finding the Amazon Marketplace to qualify as an "interactive computer service" without discussion.

           b.      The accused content was provided by another information content provider

An "information content provider" is defined by statute as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). "If a website displays content that is created entirely by third parties, then it is only a service provider with respect to that content – and thus is immune from claims predicated on that content." *Jones, supra,* 755 F.3d at 408.

Here, there is no dispute that the Redbubble Marketplace exclusively "displays content that is created entirely by third parties," namely the Sellers. [Toy Decl. ¶ 17] As a result, the content at issue must be deemed "provided by another information content provider," and the second element for establishing Section 230 immunity is established as a matter of law. *See Jones, supra* (web site was not an information content provider, even though they selected posts for publication and commented on at least one of the defamatory posts); *Eberhart v. Amazon.com, Inc.*, No. 16-CV-8546 (JPO), 2018 WL 4080348, at *6 n. 5 (S.D.N.Y. Aug. 27, 2018) (holding as a matter of law that CDA preempted a claim against Amazon.com arising out of a product listing by a third-party seller on the Amazon Marketplace).

           c.      OSU's right of publicity claim seeks to treat Redbubble as a publisher or speaker of the information in question

There is no question that OSU's right of publicity claim purports to hold Redbubble liable as a publisher or speaker of the images that it contends violates Mr. Meyer's publicity rights. In its Complaint, OSU expressly alleges that Redbubble is liable for violating Mr. Meyer's persona because it is "using it on merchandise." [Complaint, ¶ 60] OSU's Motion for Summary Judgment similarly makes clear that it seeks to hold Redbubble responsible for

publishing Mr. Meyer's image on Redbubble's web site. [OSU Motion at 26] Given these admissions, OSU cannot seriously dispute that this element is satisfied. *Oberdorf, supra,* 295 F. Supp. 3d at 502-03 (court granted summary judgment for Amazon on CDA defense, ruling that by trying to hold Amazon liable for hosting a third-party listing on the Amazon Marketplace, plaintiffs "are attempting to 'treat [Amazon] as the publisher or speaker of ... information provided by" the third-party seller).

Because the undisputed facts demonstrate that all three elements for establishing immunity under Section 230 of the Communications Decency Act have been satisfied, Redbubble is entitled to such immunity as a matter of law, and summary judgment in Redbubble's favor on OSU's right of publicity claim is appropriate.

### E. OSU'S Request for a Permanent Injunction Is Both Meritless and Premature

OSU has asked the Court to issue a permanent injunction of unspecified scope, but this request puts the cart before the horse. OSU cannot possibly be entitled to a permanent injunction unless and until it has obtained a determination in its favor on the merits. *See University of Texas v. Camenisch,* 451 U.S. 390, 396 (1981). To the contrary, as set forth above, Redbubble contends it is entitled to summary judgment against OSU on those claims.

If OSU were to prevail on its claims, Redbubble might be willing to simply stipulate to an appropriate injunction, depending on what the proposed scope is. But the scope of any relief that OSU might be entitled to, even if it were to prevail on the merits of its claims, is unclear at this point. For example, in its argument, OSU argues that Redbubble should be permanently enjoined "from using the Ohio State Marks." [OSU Motion at 27]. But OSU defines the term "Ohio State Marks" as "federally registered trademarks owned, used and licensed by Ohio State" without listing or giving Redbubble or the Court notice of whether those marks encompass only

the ten registered trademarks as Exhibits A-K to the Declaration of Mary R. True in Support of Plaintiff's Motion for Summary Judgment, or something else. [OSU Motion at 1]  And in its conclusion, OSU requests not only an injunction against the Ohio State Marks, but also against "any other words or signs or symbols or device that suggest an affiliation, approval, license, connection, sponsorship or endorsement with Ohio State," whatever that means. [OSU Motion at 30-31]

Moreover, as discussed throughout this Opposition and Cross-Motion, Redbubble has already eliminated infringement by third-party Sellers on the Redbubble Marketplace to the extent of its abilities. And it has been largely successful; OSU has only been able to point to four allegedly infringing listings over the past nine months.

Without knowing what the Court deems Redbubble's obligations to be with respect to these marks, it is difficult for Redbubble to address whether and how it might meet those obligations. Before Redbubble is subjected to an injunction under penalty of contempt, it should have the opportunity to receive notice of precisely what relief is being sought, learn from the Court what it believes Redbubble has done wrong, and have an opportunity to argue the burden associated with complying with those particular obligations.

Accordingly, Redbubble requests that the Court defer substantive briefing on OSU's injunction request until after the Court rules on this motion, if necessary.

### F.     OSU'S Request to Designate this Case Exceptional Is Without Merit

OSU's request that the Court determine this case to be "exceptional" under 15 U.S.C. § 1117, but this request is completely baseless. Under the standard set forth by the U.S. Supreme Court in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014), an exceptional case is "one that stands out from others with respect to the substantive strength of a

party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." The *Octane Fitness* court further noted that such determinations should be "rare" and must be assessed "considering the totality of the circumstances." *Id.*

Redbubble's conduct comes nowhere near meeting those standards. Redbubble firmly believes, as set forth throughout this Opposition and Cross-Motion, that it is entitled to prevail on the merits. At the very least, there is substantial authority that supports Redbubble's position that it cannot be held liable because it has not used the marks or publicity rights in question. Put simply, Redbubble's legal positions in this case are not frivolous or so substantively weak to render them "exceptional."

Nor is OSU entitled to an exceptional case determination based on the manner in which the case was litigated. Indeed, aside from the conclusory assertion that "Defendant has raised multiple affirmative defenses that are irrelevant to this case of trademark counterfeiting and direct infringement," without specifying what those defenses are or how they are irrelevant, OSU has not pointed to any purported wrongdoing regarding the "manner in which the case was litigated."

OSU claims that "[h]ad Defendant responded to Plaintiff and acknowledged that it was selling counterfeits and agreed to and promptly ceased the offering and sale of such products in April 2017, Ohio State and Defendant would not be before this Court," but this argument misstates the relevant facts. Redbubble *did* promptly respond to OSU both times that OSU contacted and expressly asked OSU for assistance in identifying the infringing conduct. [Toy Decl. Exhs. F, H] OSU ignored these requests. If OSU had provided the URLs of the allegedly infringing listings at the time they were requested, those listings would have been promptly

40

removed, consistent with Redbubble's standard practices. [*See, e.g.*, Toy Decl. ¶¶ 7, 24-28] If OSU had promptly identified later-discovered allegedly infringing listings to Redbubble promptly upon discovering them, Redbubble would have promptly removed them as well in accordance with its IP/Publicity Rights Policy, limiting any damage to OSU from their continued sale by third-party Sellers. [*See* Toy Decl. Exh. D] And if OSU had collaborated with Redbubble, like so many content owners have, on putting together proactive policing guidelines, Redbubble could have implemented such policing earlier and more effectively. [Toy Decl. ¶¶ 9-14] While OSU of course had the right to refuse to cooperate, had OSU acted differently, it could and likely would have eliminated much of the harm of which it now complains, harm brought on not by Redbubble but by third-party Sellers who have used the Redbubble Marketplace in violation of Redbubble's rules and principles.

In sum, "considering the totality of the circumstances" as the Supreme Court's opinion on *Octane Fitness* requires, this simply is not the "rare" case where a party's legal position is so frivolous or its litigation conduct so unreasonable to warrant an exceptional case determination. Accordingly, OSU's motion to have the case deemed exceptional should also be denied.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiff's Motion for Summary Judgment, and should grant Redbubble's Cross-Motion for Summary Judgment and enter judgment in favor of Redbubble on OSU's Complaint and of each cause of action therein.

Respectfully submitted,

*/s/ Gerhardt A. Gosnell II*
James E. Arnold, *Trial Attorney*   (0037712)
Gerhardt A. Gosnell II       (0064919)
JAMES E. ARNOLD & ASSOCIATES, LPA
115 W. Main St., Fourth Floor
Columbus, Ohio  43215
Telephone:   (614) 460-1600
Facsimile:   (614) 469-1093
Email:      jarnold@arnlaw.com
           ggosnell@arnlaw.com


Kenneth B. Wilson (*pro hac vice*)
COASTSIDE LEGAL
455 1st Avenue
Half Moon Bay, CA 94019
Telephone: (650) 440-4211
Email: ken@coastsidelegal.com

*Counsel for Defendant Redbubble, Inc.*


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 5, 2018, a copy of the foregoing Redbubble Inc.'s Cross-Motion For Summary Judgment And Memorandum In Opposition To Plaintiff's Motion For Summary Judgment was filed with the Court using the Clerk of Court's electronic filing system, which will send notice of this filing to all parties that have entered an appearance in this matter.


*/s/ Gerhardt A. Gosnell II*
Gerhardt A. Gosnell II